# UNITED STATES DISTRICT COURT

for the

District of Minnesota

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 14mj984 (SER) |
| v. | **UNDER SEAL** |
| CHARLES MICHAEL COLES | |

## CRIMINAL COMPLAINT

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.  On or about November 4, 2014, in Dakota County, in the State and District of Minnesota, defendant(s)

for the purpose of executing a scheme to defraud and to obtain money by means of false or fraudulent pretenses, knowingly caused to be delivered by United States Mail an envelope from Company A, in Downers Grove, Illinois, to Tessman Industrial Supply, LLC, 1360 University Avenue #377, St. Paul, Minnesota, which contained a check to Tessman Industrial Supply, LLC in the amount of $1,754.98,

in violation of Title 18, United States Code, Section(s) 1341.

I further state that I am a(n) Special Agent and that this complaint is based on the following facts:

### SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:    ☒ Yes    ☐ No

_____
*Complainant's signature*

Jared F. Kary, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12 Nov. 2014

_____
*Judge's signature*

City and state:  St. Paul, MN

The Honorable Steven E. Rau, U.S. Magistrate Judge
*Printed name and title*

SCANNED
NOV 14 2014
U.S. DISTRICT COURT ST. PAUL

STATE OF MINNESOTA )     AFFIDAVIT OF JARED F. KARY

COUNTY OF HENNEPIN )

Your affiant, Jared F. Kary, being duly sworn, does state the following is true and correct to the best of his knowledge and belief:

1.     I have been employed as a Special Agent for the Federal Bureau of Investigation for approximately six years.

2.     As an FBI agent, my duties and responsibilities consist of conducting criminal investigations of individuals and business entities for possible violations of federal criminal laws. I work in the FBI's Minneapolis, Minnesota field office, where I have been assigned to a White Collar Crime squad with responsibility for investigating violations such as bank fraud, wire fraud, mail fraud, securities/investment fraud, money laundering, and public corruption.

3.     During my employment as a Special Agent, I have participated in the execution of numerous search warrants for documents, records, and proceeds from illegal activities and have participated in the subsequent investigation and analysis of evidence seized pursuant to these warrants. Furthermore, in the course of my training and experience, I have become familiar with the types of records businesses typically maintain in the course of their regular activity, including ledgers, journals, invoices, receipts, and bank documents.

4.     This affidavit is submitted in support of a criminal complaint alleging that CHARLES MICHAEL COLES has committed mail fraud, in violation of Title

18, United States Code, Section 1341. This affidavit is also made in support of an application for a warrant to search:

> a. The single-family residence at 15073 81st Circle NE, Otsego, Minnesota, including garages and out-buildings located on the premises (the "Subject Premises"), as further described in Attachment A; and

> b. The 2006 Mercedes-Benz CLS 500C sedan, bearing Minnesota license plate 561 KMA (the "Subject Vehicle");

for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, 1341 (mail fraud).

5. This affidavit is based on my personal knowledge, interviews of witnesses, physical surveillance, information received from other law enforcement agents, my experience and training, and the experience of other agents. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging COLES with mail fraud, and for the purpose of securing a search warrant for the Subject Premises and Subject Vehicle, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint and that evidence, instrumentalities, and fruits of violations of Title 18, United States Code, Section 1341 are located at or in the Subject Premises and Subject Vehicle.

## LOCATIONS TO BE SEARCHED

6.      The Subject Premises is a beige single family home located on the west side of 81st Circle NE. The house has an attached, three-car garage located on the front left of the house. The front door is located to the right of the garage in the center of the house.

7.      On October 20, 2014, Lakeville Police obtained court authorization to place a hidden GPS tracking device on a 2006 Mercedes-Benz CLS 500C sedan, bearing Minnesota license plate 561 KMA, *i.e.*, the Subject Vehicle. According to Minnesota Driver and Vehicle Services records, this car is registered to COLES's daughter. Surveillance agents have observed COLES regularly driving this car to and from Company A, where COLES is employed, on a daily basis during October 2014. According to location data obtained from the tracking device, the Subject Vehicle was driven to Company A every weekday. After work, GPS location data shows that Subject Vehicle returned to the Subject Premises each night.

8.      COLES has checking and savings accounts at U.S. Federal Credit Union. According to records obtained from U.S. Federal Credit Union, COLES listed the Subject Premises as his address for the account.

9.      COLES has also obtained checking and savings accounts at TCF Bank in July 2014. Records obtained from TCF Bank show that COLES listed the Subject Premises as his address.

10.     According to Wright County records, Individual M owns the Subject Premises. Records obtained from U.S. Federal Credit Union show that COLES has

wired $2,000 to Individual M approximately once a month since March 2013, which is consistent with monthly rent payments.

## BACKGROUND

11.    Company A is a large food packaging and processing company based in the Chicago area. Company A has a food packaging plant located in Lakeville, Minnesota (the "Lakeville plant").

12.    COLES has been employed at the Lakeville plant since approximately 2006. In about 2011, COLES was promoted to the position of MRO Buyer/Inventory Coordinator. In that position, COLES is responsible for ordering, purchasing, and receiving parts for use in the food packaging plant. Among other things, COLES is responsible for ordering parts, submitting purchase orders, receiving shipments of parts, and maintaining the parts inventory at the Lakeville plant.

13.    In February 2014, an employee at Company A discovered a suspicious purchase order through an unfamiliar, Twin Cities-based vendor. The employee tried to verify the identity of the vendor through an internet search and discovered that the vendor appeared to be an antique moving company. The employee then reported the suspicious parts order to his/her supervisor.

14.    According to Company A employees, after receiving the report, the company conducted a review of parts ordering by COLES. During this in-house investigation, company employees found several more suspicious orders that COLES had placed with unknown or unverified businesses. The company also found instances where COLES had ordered parts that were either obsolete or no longer

being used by the company. According to Company A employees, these suspicious orders had been placed by COLES over an extended period of time dating back to 2011.

15.     Company A later retained a Chicago-based private investigation firm to conduct an internal investigation of suspicious parts ordering at the Lakeville plant. According to one of the investigators, during the investigation, the firm found evidence that COLES had created fake purchase orders related to six fictitious vendors: (a) Tessman Industrial Supply, LLC; (b) Rubber-Steel Products, LLC; (c) DG Automation Controls, LLC; (d) Karlvelous Quality Antique Movers and Transportation, LLC; (e) A-Z Industrial Supply, LLC; and (f) Tri-Industrial Supply, LLC. According to the investigation firm, COLES had ordered over $1.7 million worth of parts from these six companies between 2011 and 2014. The firm found several indications that these firms were fictitious and that the purchase orders were fraudulent. For example, the addresses provided on the purchase and shipping orders were discovered not to be physical businesses, but rather to be post office boxes located at UPS stores. In addition, the invoices submitted for purchase orders from these companies did not include shipping sales tax. In contrast, according to Company A, purchase orders and invoices for parts ordered from other companies almost always included shipping sales tax.

16.     In approximately October 13, 2014, Company A reported the suspected fraud to law enforcement. The Lakeville Police Department, U.S. Postal Inspection

Service, the FBI, and the Internal Revenue Service, Criminal Investigation Division began an investigation.

17.     As discussed in more detail below, during the ensuing investigation, agents found evidence that since 2011 COLES has been submitting fake purchase orders for items purportedly ordered from six front companies, including a company called Tessman Industrial Supply, LLC.

## COLES Recruited the CS to Organize a Front Company Called Tessman Industrial Supply, LLC

18.     According to Minnesota Secretary of State records, Tessman Industrial Supply, LLC, was registered in the state of Minnesota on January 22, 2013. The articles of organization identify the company's principal place of business as 1600 University Avenue #208 in St. Paul, Minnesota.

19.     According to surveillance conducted in October 2014, a UPS store is located at 1600 University Avenue #208 in St. Paul, Minnesota.

20.     According to Company A records, on January 24, 2013—two days after Tessman was registered with the Minnesota Secretary of State—COLES submitted a purchase order and invoice for $1,844 worth of parts from Tessman Industrial Supply, LLC.

21.     Records obtained from Company A show that COLES submitted invoices for over $240,000 in orders from Tessman Industrial Supply, LLC between January 2013 and November 2014.

22.   According to Company A's records, payments for purported shipments were sent to a post office box at a UPS Store location on University Avenue in St. Paul.

23.   On or about November 6, 2014, federal agents interviewed a cooperating source who had information about Tessman (the "CS"). After being approached by agents and questioned regarding the CS's role in Tessman, the CS agreed to cooperate with agents. The CS is cooperating in hopes of receiving consideration with respect to possible federal charges for the CS's involvement in this fraud scheme. No promises have been made in exchange for the CS's cooperation.

24.   According to the CS, in approximately January 2013, COLES called and asked if the CS wanted to make some money. COLES said that he needed someone to start a company. COLES explained that he would then submit invoices for products or material supplied by the company to COLES's employer, Company A. COLES explained that he would approve the invoices, but that no products or materials would actually be supplied to Company A. COLES said that he and the CS would share the resulting proceeds. The CS agreed to participate in the scheme.

25.   According to the CS, COLES completed the paperwork organizing the company—Tessman Industrial Supply, LLC—which the CS then signed. At COLES's direction, the CS then rented a post office box at a UPS store in St. Paul, and opened an email account for the company.

26.     According to the CS, when the scheme first began, COLES created invoices from Tessman for products allegedly supplied to Company A. Later, COLES completed the invoices himself. The CS explained that COLES would create the invoices and then email them to the Tessman email account. COLES instructed the CS to email the invoices to Company A.

27.     The CS gave agents permission to access the Tessman email account. During their search of the account, agents found approximately eight invoices that, according to the CS, COLES had created and sent to the CS so that the CS could forward them to Company A for payment. For example, agents found an invoice had been sent to the Tessman email account on October 27, 2014 at approximately 9:05 p.m. At the time, a GPS tracking device showed that the Subject Vehicle regularly driven by COLES was parked at the Subject Premises.

28.     The CS explained that after COLES submitted invoices for products purportedly supplied by Tessman Industrial Supply, Company A would send payment by check to a post office box at a UPS store located on University Avenue in St Paul. After receiving the checks, the CS generally cashed the checks and then arranged to meet with COLES. The CS cashed the checks at HiWay Federal Credit Union.[1] The credit union charged a five percent check cashing fee, and the CS then split the remaining money with COLES.

_____

[1]     According to HiWay Federal Credit Union records, the CS is the signatory on an account in the name of Tessman Industrial Supply.

**COLES Accepted an $830 Payment from the CS on November 7, 2014**

29.    The CS told agents that a check from Company A to Tessman had arrived in the mail on November 4, 2014. The check had been sent via United States mail from Company A's office in Downers Grove, Illinois to the UPS mailbox rented by the CS in St. Paul, Minnesota. The CS turned the check over to law enforcement. The check was written out for $1,754.98 from Company A to Tessman Industrial Supply. According to Company A, this check was intended as payment for products purportedly ordered by COLES from Tessman Industrial Supply.

30.    After being approached by law enforcement, the CS agreed to meet with COLES and pay COLES his portion of the proceeds of the November 4 check while wearing a hidden audio/video recording device.

31.    On the afternoon of November 7, 2014, the CS exchanged text messages with COLES. During the exchange, COLES agreed to meet the CS in the parking lot of a Target store located in Roseville, Minnesota that afternoon.

32.    Prior to the meeting, agents outfitted the CS with a hidden audio/video recording device. Agents also provided the CS with $830 in cash with which to pay COLES. Agents recorded the serial numbers on all of the cash prior to giving the money to the CS.

33.    On November 7, 2014, at approximately 2:31 p.m., surveillance agents observed the CS park in the parking lot of the Target store in Roseville, Minnesota. Shortly after the CS arrived in the parking lot, agents observed COLES arrive in

the parking lot in the Subject Vehicle and park next to the CS's car. COLES got into the front passenger seat of the CS's car.

34.     As reflected in the video recording, after COLES got into the Subject Vehicle, the CS handed COLES the $830 in prerecorded funds. COLES then put the money in his pocket. At approximately 2:35 p.m., COLES then returned to the Subject Vehicle and left the parking lot.

35.     According to surveillance agents, after leaving the parking lot, COLES drove in the Subject Vehicle to a clothing store located on the 8000 block of Brooklyn Boulevard in Brooklyn Park, Minnesota. COLES entered the store at approximately 3:00 p.m. and exited at approximately 3:15 p.m. According to store employees, COLES purchased approximately $49 worth of merchandise at the store. He did not use the prerecorded funds that he had received from the CS.

36.     At approximately 3:18 p.m., surveillance agents observed COLES arrive in the Subject Vehicle at an Applebee's restaurant located on the 7900 block of Brooklyn Boulevard in Brooklyn Park, Minnesota. When he left the Subject Vehicle, COLES took a black bag with him into the restaurant. While inside the restaurant, agents observed COLES remove a laptop form the black bag and work on the laptop. According to surveillance agents, COLES appeared to be accessing email on the laptop. Agents later observed COLES leave the restaurant at approximately 5:10 p.m. COLES entered the Subject Vehicle and placed the bag containing the laptop in the rear seat. According to store employees, COLES paid for his food with a credit card.

37.   At approximately 5:22 p.m., agents observed COLES enter a Red Lobster restaurant located on the 12500 block of Elm Creek Boulevard in Maple Grove, Minnesota. Agents later observed COLES leave the restaurant at approximately 6:33 p.m. According to store records, COLES purchased approximately $83 worth of food. COLES paid his bill using a pre-recorded $100 bill that he had received from the CS earlier that day.

38.   At approximately 6:58 p.m., surveillance agents observed COLES enter a movie theater located in Rogers, Minnesota. Agents later observed COLES leave the theater in the Subject Vehicle at approximately 8:59 p.m.

39.   Surveillance agents then observed COLES drive in the Subject Vehicle from the movie theater to the Subject Premises. COLES arrived at the Subject Premises at approximately 9:10 p.m.

**COLES Submitted Fraudulent Invoices From Other Front Companies**

40.   During the course of the investigation, agents have obtained evidence that COLES submitted fraudulent invoices for products purportedly supplied to Company A by other front companies. Again, a review of the invoice history, the physical location of the companies, and the bank records suggests that these companies did not actually supply products to Company A, but instead were organized by COLES and others in order to submit fraudulent invoices to Company A.

**Rubber-Steel Products, LLC**

41.    According to Minnesota Secretary of State records, Individual A filed the articles of incorporation for Rubber-Steel Products, LLC on or about October 10, 2011. The articles of incorporation identify 6066 Shingle Creek Parkway #140 in Brooklyn Center, Minnesota as the company's principle place of business.

42.    According to U.S. Postal Service records, Individual A filed an application requesting that mail addressed to Rubber-Steel Products, LLC, be delivered to its agent, Individual A, at 6066 Shingle Creek Parkway #140 in Brooklyn Center, Minnesota.

43.    According to surveillance conducted in October 2014, 6066 Shingle Creek Parkway is a UPS store.

44.    On October 14, 2011—four days after Rubber-Steel Products, LLC, was registered with the Minnesota Secretary of State—COLES sent an email with the subject line "new vendor" to an employee in Company A's accounts payable department. In the email, COLES said that he had added Rubber-Steel Products, LLC as a "new vendor set up in the system." COLES provided a U.S. Bank account and routing number for the company so that Rubber-Steel Products, LLC could receive payments from Company A by direct deposit.

45.    According to Company A records, the following day, October 15, 2011, COLES submitted a purchase order and invoice for an order of approximately $1,813 worth of parts from Rubber-Steel Products, LLC.

46.     Records obtained from Company A show that COLES submitted invoices for approximately $498,701 in orders from Rubber-Steel Products, LLC, between October 2011 and August 2014.

47.     None of the invoices submitted by COLES for parts purportedly ordered from and supplied by Rubber-Steel Products, LLC, incorporated shipping sales tax into the cost of the order.

48.     Records obtained from U.S. Bank pursuant to a subpoena show that a business account for Rubber-Steel Products, Inc. was opened on October 11, 2012. Individual A is the signatory on the account. From the account opening until October 2014, approximately $499,291 has been deposited into the account. Approximately 99.9% of these deposits were from Company A. A review of the bank account statements show that a significant portion of these deposits have been withdrawn in cash or transferred to another of Individual A's accounts. Bank records show that the much of the remaining funds in the account were used for expenses that appear to be personal in nature, such as a gym membership, purchases at retails stores such as Target and Walmart, and charges at fast-food restaurants. Based on my training and experience, such expenses are personal in nature and are not indicative of an active business.

49.     According to surveillance conducted multiple times in October 2014, a gold Ford Explorer, bearing Minnesota license plate 278 NMB registered to Individual A has been parked at the Subject Premises. The vehicle was observed parked in the driveway of the Subject Premises on October 17, 20, 22, 24, and 26.

**DG Automation Controls, LLC**

50.     According to Minnesota Secretary of State records, on or about December 15, 2011, Individual B filed the articles of incorporation for DG Automation Controls, LLC. The articles of incorporation identify the company's principal place of business as 9637 Anderson Lakes Parkway, Suite 301, in Eden Prairie, Minnesota. Individual B is listed as the registered agent.

51.     According to U.S. Postal Service records, Individual B filed an application requesting that mail addressed to DG Automation Controls, LLC, be delivered to Individual B at 9637 Anderson Lakes Parkway, Suite 301, in Eden Prairie, Minnesota.

52.     According to surveillance conducted in October 2014, a UPS store is located at 9637 Anderson Lakes Parkway in Eden Prairie, Minnesota.

53.     On January 9, 2012—approximately three weeks after DG Automation Controls, LLC was registered with the Minnesota Secretary of State—COLES sent an email to an employee in Company A's accounts payable department stating that he had added DG Automation Controls into the system as a "new vendor." In the email, COLES provided information for an account at Guaranty Bank for direct deposit.

54.     Three days later, on January 12, 2012, COLES submitted a purchase order and invoice for the purchase of approximately $1,840 worth of parts from DG Automation Controls, LLC.

55. Records obtained from Company A show that COLES submitted invoices for approximately $395,427 in orders from DG Automation Controls, LLC, between January 2012 and August 2014.

56. None of the invoices submitted by COLES for parts purportedly ordered from and supplied by DG Automation Controls, LLC, incorporated shipping sales tax into the cost of the order.

57. Records obtained from Guaranty Bank pursuant to a subpoena show that Individual B opened a business account for DG Automation Controls, LLC on December 19, 2011. At the time of the account opening, Individual B deposited $100 into the account. A review of the account statements from the DG Automation Controls, LLC account at Guaranty Bank shows an unusual pattern of deposits and withdrawals. From the account opening until October 2014, a total of approximately $396,687 has been deposited into the account. Approximately 99.7 percent of the total deposits were from Company A. In addition, bank statements show that after an invoice was paid by Company A, approximately half of the funds were typically withdrawn in cash the same day or shortly thereafter. The remaining funds were generally used for expenses that appear to be personal in nature, such as restaurant charges, movie rentals, casino gambling, and cable television bills. Based on my training and experience, such expenses are personal in nature and are not indicative of an active business.

**A-Z Industrial Supply, LLC**

58.     A-Z Industrial Supply, LLC, is a limited liability company registered in the State of Arizona on May 28, 2014. According to records obtained from the State of Arizona's Corporation Commission, Individual C is the owner of A-Z Industrial Supply, LLC. The articles of incorporation list the company's physical address as 18634 N. 28th Way in Phoenix, Arizona.

59.     According to surveillance conducted in October 2014, 18634 N. 28th Way is a single-family home located in a residential neighborhood.

60.     On June 12, 2014—approximately two weeks after A-Z Industrial Supply, LLC was registered with the State of Arizona—COLES sent an email to the an employee in Company A's accounts payable department stating that he had added A-Z Industrial as a "new vendor." In the email, COLES said that the company preferred to receive payment via direct deposit to a TCF Bank account. COLES provided the account information in the email.

61.     Company A records show that on June 13, 2014, COLES submitted a purchase order and invoice for a $2,004 order from A-Z Industrial Supply, LLC.

62.     Records obtained from Company A show that COLES submitted 14 invoices for approximately $36,317 in orders from A-Z Industrial Supply, LLC between June 2014 and August 2014.

63.     Records obtained from TCF Bank pursuant to a subpoena show that Individual C opened a business account for A-Z Industrial Supply, LLC on June 10, 2014. From the account opening until November 10, 2014, a total of approximately

$57,597 has been deposited into the account. Approximately 63 percent of the total deposits were from Company A. The remaining deposits into the account were cash deposits.

64.    In addition, TCF Bank records show that a significant amount of the withdrawals from the account involved charges at fast-foot restaurants and retail stores, including Panda Express, Pizza Hut, Chipotle, TJ Maxx, Sports Authority, and Sally Beauty. In my experience, these are not the type of expenses that would be incurred by a legitimate manufacturing or industrial supply company.

## INFORMATION REGARDING ITEMS TO BE SEIZED

65.    Based on my training and experience in conducting similar investigations, your affiant knows

a.    Individuals, including those receiving income from fraud schemes, often maintain within their residence items evidencing their possession of assets and personal financial transactions. These items often include personal financial statements, receipts, invoices, bank statements and records, bank money order and cashier's check receipts, property records, investment records, stock and bond records, tax records, correspondence, diaries, and handwritten notes. These records are often maintained for extended periods of time, often years.

b.    Businesses (even those engaged in fraudulent activity) generally maintain or keep journals, ledgers, bank statements and records, receipts, invoices and other documents evidencing the receipts and disbursements of funds, inventories, assets of the business and personnel information. These records are

usually kept and maintained for extended periods of time, often several years, at the place of business or residence. Your affiant knows from previous investigations that when records are maintained at the residence of subjects, records are often stored in outbuildings, sheds, garages, and storage facilities. Thus, your affiant requests permission to search any outbuilding or storage sheds that are on the premises of COLES's residence.

## BACKGROUND REGARDING SEIZURE OF COMPUTER EQUIPMENT

66.    As described above, your affiant believes that COLES is creating and submitting electronically fraudulent invoices from the Subject Premises as set forth above. In the past, your affiant has consulted other law enforcement officers who have been certified in computer forensics. These examiners specialize in computer forensics, including the identification, search, seizure, examination, and analysis of computer and electronic evidence. Based upon my own knowledge, training, experience, and consultations with these examiners, your affiant knows that computer equipment, such as computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in that they: may be instrumentalities, fruits, or evidence of crime, and/or; may have been used to collect and store information about crimes (in the form of electronic data).

67.    Based upon my knowledge, training, experience, and the experience of other law enforcement personnel, your affiant knows that computer hardware and computer software may be utilized to store records which include, but are not

limited to, those relating to business activities, criminal activities, associate names and addresses, victims' names, addresses, and images, and the identity and location of assets illegally gained through criminal activity, and other information related to the activity, such as locations of further information related to a criminal activity.

68.   Computer hardware may be described as any and all devices capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar computer impulses. Computer hardware includes, but is not limited to, any data processing devices (such as central processing units, self-contained laptop and notebook computers, hand-held electronic organizers, personal digital assistants (PDAs), and WebTV units), memory typewriters, removable media, internal and external storage devices (magnetic storage devices such as hard disk drives, diskette drives, and tape drives, optical storage devices such as CD-ROM drives, CD-R/CD-RW recorders, and DVD drives/recorders, and other memory storage devices, such as Subscriber Information Module (SIM) cards), flash memory devices, digital cameras, digital media players such as an iPod, cellular telephones or smart phones, printers, scanners, plotters, circuit boards, monitors, television sets, communication devices such as modems, cables, connectors, programmable telephone dialing or signaling devices, and electronic tone-generating devices, and any devices, mechanisms, or parts that can be used to restrict access to computer hardware such as physical keys.

69.   Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data. Data security

devices may consist of hardware, software, or other programming code. A password or passphrase (string of alphanumeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, cards, and circuit boards. Data security software or digital code may include a programming code that creates "test" keys or "hot" keys, which perform certain preset security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

70.     Based upon my knowledge, training, and experience, and the experience of other law enforcement personnel, your affiant knows that records stored on computer hardware and software may be more fully described as information or data stored in the form of electronic, magnetic, or digital coding on computer media or on media capable of being read by a computer or computer-related equipment. This media includes, but is not limited to, fixed hard drives and removable hard drive cartridges, compact discs, DVDs, tapes, floppy diskettes, flash drives, flash memory, SIM cards, and any other media capable of storing electronic, magnetic, or digital coding.

71.     Searching and seizing information from computers often requires examiners to analyze every file on a computer, because every file has the potential to contain evidence. The file name and file type can be easily changed to anything the user wishes it to be. For example, a user may change the name and file type of a photo so that it will appear to be a text file, and vice versa. In many cases, the only

way a searcher can determine the true content of a file is to open it and view its contents. In addition, deleted files can remain on a computer's hard drive or other related electronic storage media for an indefinite period of time, allowing forensic analysts the ability to recover some or potentially all of the deleted files.

72.    Based upon my knowledge, training and experience, and the experience of other law enforcement personnel, your affiant knows that in order to completely and accurately retrieve data maintained in computer hardware or on computer software, all computer equipment, should be processed by a qualified computer specialist in a laboratory or other competent setting. This is due to:

a.    The volume of evidence. Computer storage devices (like hard disks, removable media, optical media, diskettes, tapes, laser disks, Bernoulli drives) can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names, or use encryption or steganography software. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site;

b.    The technical requirements. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and

applications, so it is difficult to know before a search which expert is qualified to analyze a system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (from external sources or destructive code imbedded in the system as a booby trap), a controlled environment is essential to its complete and accurate analysis. Further, when a user deletes a file on a computer, only the pointer (a tool that tells the operating system where the file is located on the media) to the file is deleted. The actual file may remain on the media for a long period of time, possibly years. Forensics examiners can use software tools that can locate and partially and/or fully recover deleted files;

        c.     System Functionality. Computer systems are very complicated and the proper operation of the system may be dependent upon the hardware that is connected to it. For this reason, it is usually necessary to seize all hardware connected to the equipment in order to ensure the proper operation of the system during the analysis process.

## CONCLUSION

73.    Based on the facts set forth above, and based on my training, experience, knowledge, and the aforementioned facts of this investigation, there is probable cause to believe that COLES has committed mail fraud, in violation of Title 18, United States Code, Section 1341, and there is probable cause to believe

that evidence, fruits, and/or instrumentalities of the above offenses can be found at

the single-family residence at 15073 81st Circle NE, Otsego, Minnesota, including,

garages, and out-buildings located on the premises (the "Subject Premises"), and in

the black 2006 Mercedes-Benz CLS 500C sedan, bearing Minnesota license plate

561 KMA (the "Subject Vehicle").


Further your Affiant sayeth not.

Jared P. Kary
Special Agent
Federal Bureau of Investigation


SUBSCRIBED and SWORN to before me

this 12 day of Nov. 2014

The Honorable Steven E. Rau
U.S. Magistrate Judge

23